Filed 2/28/23  In re I.D. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re I.D., a Person Coming Under the Juvenile Court Law. | D080675 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. Nos. J521021A-C) |
| Plaintiff and Respondent, | |
| v. | |
| I.D. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Browder A. Willis III, Judge.  Reversed and remanded for further proceedings.

Janelle B. Price, under appointment by the Court of Appeal, for Defendants and Appellants.

Liana Serobian, under appointment by the Court of Appeal, for Respondent Father.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Respondent Mother.

Claudia G. Silva, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa Maldonado, Deputy County Counsel, for Plaintiff and Respondent San Diego County Health and Human Services.

The juvenile court sees the full spectrum of the human experience, from abject tragedies to instances of reaffirming hopefulness. And then there are cases like this that are impossible to describe, much less conclusively evaluate. In a moment of understatement, the judge here concluded, "[T]here is something going on in that household that creates a danger and a risk" to the children who are the subject of this dependency action. Yet despite the virtually undisputed evidence that the children's father, R.D. (Father) was at the center of the "something" going on, the court elected to leave them in his care and custody, albeit on condition that he reside with the maternal grandparents. Although we routinely defer to the best judgment of the juvenile court in such placement matters, this is the exceptional case where the evidence points to only one reasonable conclusion—that Father represents a substantial danger to the children's health and well-being if they are left in his care. Accordingly, while we affirm the court's order declaring the children dependents under section 300, subdivision (b)(1) of the Welfare and Institutions Code,[1] we reverse the dispositional order and remand for further proceedings.

---

[1]     All other statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Family History*

In April 2022, the San Diego County Child Abuse Hotline received a report of neglect and abuse involving minors I.D. (age 13), T.D. (age 12), and A.D. (then age 4).  A social worker from the San Diego County Health and Human Services Agency (Agency) investigated the report, which included allegations that unknown individuals were entering the family's home and engaging in sexual activity with H.D. (Mother) while the children and Father slept.  Father allegedly had video evidence of these activities, but he claimed he was unable to access the videos because people were breaking into his home, his phone and his camera system and deleting them.  The videos that Father provided the social worker and police failed to show the activities he claimed were recorded.  Mother had no memory of the alleged activities.

Father additionally maintained that "car loads" of unknown individuals were going to the home where they tracked and stalked the family.  He reported strange noises outside the home, claiming that a wire to the internet box was cut and window screens were damaged.  The police were contacted, but they determined no crime had been committed.  Father owns a rifle, and recently purchased a handgun and a shotgun to protect the family from people he claimed were coming near the home.

The family has repeatedly relocated to various motels and relatives' homes to evade the unknown stalkers.  Even so, Father believed these stalkers were able to locate the family.  He told the children that strangers were around their home, that he had videos of them, and that Mother needed to be restrained so she would not contact or engage in sexual activities with them.  He restrained Mother with tape, handcuffs, and a straitjacket, and locked her in a closet to prevent her from having sex with strangers.  The

children believed Father's claims, including that these "safety measures" failed to work as Mother somehow escaped and then returned to her restraints. They reported trying to stay awake to ensure Mother did not get away, which adversely impacted their school attendance and participation.

The two older children became angry after being told of Mother's alleged sexual activity with strangers, and both participate in therapy to address their emotions. I.D., the oldest child, was described as hypervigilant, terrified, anxious, and sad because of the events he believed were taking place around their house. He reported feeling responsible for protecting his younger siblings, and experiencing nightmares and trouble breathing due to anxiety. I.D.'s therapist diagnosed him as having an adjustment disorder with mixed anxiety and depression. She confirmed that the issues reportedly occurring at home left him sleep deprived. Mother's psychiatrist and Father's therapist both expressed concern about the children's safety while residing in a chaotic home with parents who have untreated mental health issues.

Mother had restraining orders against Father in 2009 and 2019 to protect her and the children from domestic violence. Father then completed services for domestic violence. He was psychiatrically hospitalized in 2019 where he was diagnosed with major depressive disorder and posttraumatic stress disorder. Although he had been prescribed psychotropic medication, he denied taking it currently because he did not think he needed it.

During her interview, Mother requested that Father be present for emotional support. She had no key to the home and no cellphone, so she could not contact or invite strangers into the home. While she denied recalling the activities with strangers that Father reported, she believed some had happened as he described.

Mother's psychiatrist diagnosed her with major depressive disorder and was evaluating her for dissociative identity disorder and/or schizoaffective disorder. She participated in therapy, and the therapist expressed concern that she was being manipulated psychologically by Father. The Agency was concerned that it appeared to be the same pattern of control that characterized the relationship when domestic violence was alleged in 2009. Then, like now, Father reportedly controlled and isolated Mother, subjecting her to continual surveillance.

On May 11, 2022, the Agency requested and the court issued a protective custody warrant, removing the children from their parents' custody out of concern for their safety. It then filed a petition alleging that the children came within the provisions of section 300, subdivision (b)(1). Specifically, the petition asserted that the children have suffered or were at risk of suffering serious physical harm or illness by the inability of the parents to provide regular care for children due to the parents' mental illness, developmental disability, or substance abuse.

B.    *Detention Hearing*

Two days later, on May 13, the court held a detention hearing. The Agency recommended that the children be removed from their parents' care and that the parents be allowed supervised visitation. These recommendations were based on concerns regarding the children's safety due to Father's continued and escalating pattern of control over Mother and both parents' declining mental health. In the Agency's view, there was "reason to believe that the children and [M]other are at risk of possible death if left in the [F]ather's care."

The court detained the children and ordered supervised visitation for each parent separately. It expressed concern about the children's emotional

5

well-being, including the anxiety, depression, and sleep disturbances they were experiencing. The children were allowed to remain with the maternal grandparents and were to receive therapy without the presence of a parent. The parents were to receive psychological evaluations and were allowed to visit the children according to a schedule.

C.      *The Agency's Reports*

In June and July 2022, the Agency prepared and filed a jurisdiction/disposition report and a series of addendum reports. The children continued to reside with the maternal grandparents and were interviewed multiple times. I.D. reported ongoing domestic violence with Mother as the aggressor because she gets angry that "no one believes her." He reiterated his understanding that people were stalking the family and breaking into their home, and said he felt exhausted, angry and sad. His mental health evaluation suggested that depression, anxiety, anger, and adjustment to trauma adversely affected his ability to function.

T.D. believed he was in protective custody because the "government" thought his parents were not keeping the children safe when they argued. He explained that they had cameras installed inside and outside the home to protect them from the strangers Father said were coming to the home. He reported feeling angry and sad, and his mental health evaluation concluded that anger was adversely affecting his ability to function.

A.D. believed she was living with maternal grandparents because Mother had done " 'too much stuff' " that was " 'kinda bad.' " She was otherwise unable to articulate what was happening with her parents. Her mental health assessment revealed multiple areas of concern that needed to be monitored.

Although she had no independent recollection, Mother accepted Father's reports that she continued to escape from restraints to have sexual encounters with unknown individuals. She explained that she never experienced memory loss before January 2022. In May 2022, while seeking treatment at San Diego Mental Health Hospital, fentanyl was found in her system although she had no recollection of taking it. She declined to be treated on an inpatient basis. Later that month, Mother was taken to the hospital due to an overdose of her psychotropic medication. She claimed it was impulsive and "mostly" an "accident." Since then, Father said he has taken responsibility for dispensing Mother's medication to avoid overdoses.

In June 2022, Mother sought treatment at the hospital after feeling "out of it." Again, she tested positive for fentanyl without any recollection of taking it. Later that month, Mother woke up with bruising on her face, red marks on her neck, and swelling on her eye, lips and leg/foot. She was taken to the hospital for evaluation and treatment and stated her belief that she was drugged and sexually assaulted by a neighbor, despite having no recollection of such an event. Mother, however, was reportedly handcuffed to Father that night as a "safety" precaution. The injuries were determined have resulted from an assault, but police did not believe there had been a crime.

Although the children exhibited some behavioral issues while living with the maternal grandparents, they felt safe and were sleeping better. They also said they wanted to be placed with their parents or Father. Both T.D. and I.D. received treatment for depression, anxiety and/or stressors and behavioral dysregulation. T.D. continued to suffer from an adjustment disorder with mixed anxiety and depressed mood. He was classified as a

victim of emotional abuse. I.D. was diagnosed with posttraumatic stress disorder.

According to the Agency, "the power and control dynamic that is typically present with domestic violence" was still apparent in the parents' relationship. Because the video evidence failed to support Father's claim of Mother's alleged sexual encounters, the Agency believed he was delusional or fabricating the encounters "in an attempt to control [Mother] and maintain his power over her." Of further concern was that Father's unsubstantiated allegations led the children and those in Mother's support system to question Mother's mental health. The Agency stated that the children "have been significantly impacted by the parents' delusions and continue to suffer the emotional impact even while separated from the parents." It concluded that "it is not safe for the children to return home to their parents until they are able to consistently demonstrate that they are addressing their mental health over a period of time."

D.    *The Parents' Psychological Evaluations*

In June 2022, Mother and Father both completed psychological evaluations. Mother was diagnosed with schizoaffective disorder, depressive type with persecutory delusions, generalized anxiety disorder, personality disorder, primarily dependent, paranoid, and borderline features. The evaluator concluded that Mother was "exhibiting delusions due to her fixed beliefs which are contrary to evidence" and that her "[b]eliefs are based on information received from [Father] and via vague video and audio footage in which multiple collateral reporters, to include police officers and hospital staff, have been unable to depict [*sic*] such acts." Mother is "highly dependent in her relationship" with Father and put his needs "above those of hers and her minor children." She also "expos[es] her children to frequent

8

domestic disputes and arguments," which "last[ ] for hours at a time," and "allow[s] her children to witness her being restrained and boarded up to appease [Father's] fears of infidelity." The evaluator believed that Mother should enroll in an inpatient, residential, or intensive day treatment program. It was also "highly recommended" that she participate without Father "due to concerns of ongoing domestic violence dynamics and potential for a shared psychotic disorder."

Father was diagnosed with a delusional disorder involving jealousy and persecution, a severe major depressive disorder, an unspecified trauma-related disorder, and antisocial personality traits. It was noted that, after he returned home following modification of the restraining order in 2021, "there have been multiple allegations of [Father's] efforts to utilize power and control tactics upon the family, including efforts to convince [Mother] of the alleged sexual abuse, intruder, and escape delusions and including the children in the reported response to these beliefs." In the evaluator's opinion, Father embraced "beliefs that are without substantiation, are absent of supportive evidence, are highly implausible, and exceedingly resistant to challenge."

The evaluator continued, "Given the history of substantiated domestic violence, as well as concerns over potential delusional behaviors and power and control dynamics, . . . the veracity of his claims and the explanation of the motives for his actions has been repeatedly called into question. [Father's] flawed reasoning and possession of multiple firearms further cause concern that his impaired perceptions can lead to disproportionate reactions, potentially leading to use of the weapons." Furthermore, "[t]he most emergent factor that resulted from [Father's] evaluation is the presence of fixed false beliefs related to the sexual indiscretions of his wife, the uninvited

9

intrusion by unknown individuals [in]to the family home, hypervigilance and paranoid ideation about the safety and security of the home, and the unfortunate drawing in of his two eldest children [in]to the delusional beliefs and their respective efforts to address their [F]ather's misguided concerns." Father "struggles to appreciate the severity of his actions as abusive or neglectful toward his children."

The evaluator recommended that Father engage in cognitive-behavioral therapy, metacognitive training, and pharmacological interventions to address his delusional disorder. A referral to a domestic violence offender's group was recommended "[d]ue to the dynamics of power and control in the relationship, documented by previous domestic violence, issues of limiting [Mother's] access to her family, telephone, and periods in which she had been physically restrained, handcuffed, placed in a straightjacket, and/or confined and barricaded in a locked room, unfounded and delusional accusations of infidelity without justification, and introduction of the dynamic to their children, resulting in their internalization of Father's beliefs[.]"

E.     *The Contested Hearing*

In July 2022, the court held a contested jurisdictional and dispositional hearing where the Agency's reports and the parents' psychological evaluations were entered into evidence. The Agency's recommendations were supported by testimony from the social worker. Father testified about the services he was receiving and his relationship with the children. He also confirmed that he administered Mother's medication and drove her to appointments. He maintained that strangers were coming into his house at night to have sexual encounters with Mother, and that the strangers followed them when they moved to different hotels and to paternal grandparents' home.

10

At the hearing, the Agency argued that no progress had been made since the children were detained, pointing out that Father still believed Mother was escaping at night and that she could not care for herself without his management and assistance. The Agency agreed with a psychologist who evaluated Father and concluded that his false beliefs and behavior posed a risk to the children. Minors' counsel recognized that a bond exists between Father and the children, but also noted that it led the children to share in Father's delusions. She joined the Agency, agreed with the evaluator that Father posed a risk of harm to the children, and requested that they be removed from parents.

Counsel for each parent argued that the court should not take jurisdiction, but that if it did both parents should have unsupervised visits. Although Father's counsel acknowledged there was "obviously something occurring in this household," he asserted that the children had never been harmed physically and that Father's behavior was that of a concerned father and husband. He did not address the evaluator's finding that Father's beliefs were delusional, but instead maintained that Mother's mental health issues justified Father's actions and beliefs.

Prior to its ruling, the court asked Father's attorney to comment on Father's psychological evaluation because it was the "only professional opinion as to [Father's] mental health status." Only then did counsel concede "there does seem to be an embracing of beliefs that don't seem to be substantiated." But the lawyer insisted that "Father did not ask the children to become involved in this" instead, "they wanted to help." He also stated that the evaluator did not believe "the children's lives are in danger or the children would be physically harmed" by Father.

11

The court recognized "there is something going in that household" that "creates a danger and a risk" and acknowledged the children have become a part of it. At the same time, however, it noted "a jumble of confusion" as to "what is the reality in this case." The court ultimately found that notwithstanding this state of confusion, there was a preponderance of the evidence to sustain the petition under section 300, but not clear and convincing evidence to remove the children from both parents' care as is required by section 361.

As a result, the court sustained the petition, made a true finding by preponderance of the evidence, and declared the children dependents of the court. The children were removed from Mother's care and placed with Father on condition that he live with the maternal grandparents. Substance abuse and domestic violence services were deleted from Father's case plan, and the court ordered liberal supervised visitation with Mother.[2]

## DISCUSSION

The children appeal from the juvenile court's order returning them to Father's care.

A.     *Legal Principles*

Section 300 describes the various ways that a child comes within the jurisdiction of the juvenile court. (§ 300.) Relevant here, and as alleged in the petition, section 300, subdivision (b)(1)(D), provides that a child "is within the jurisdiction of the juvenile court" if "[t]he child has suffered, *or* there is a substantial risk that the child will suffer, serious physical harm or illness, . . .

---

[2]     Minors' counsel requested an immediate stay, which was denied. After filing a notice of appeal, counsel then sought a writ of supersedeas from this court, which we denied.

12

by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness . . . ." (Italics added.)

The purpose of the dependency scheme is "to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2, subd. (a).) "The focus shall be on the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child." (*Ibid*.) While continued care by the parent is presumed, removal from a parent's care is supported if there is clear and convincing evidence there would be substantial danger to the physical health, safety, protection, or physical or emotional well-being if the child were to be returned home, and there are no reasonable means by which the child can be protected. (§ 361, subd. (c)(1).)

Appellate courts typically review a juvenile court's factual findings for substantial evidence. (*In re J.K.* (2009) 174 Cal.App.4th 1426,1433; *In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992 (*Yolanda L.*); *In re Sheila B.* (1993) 19 Cal.App.4th 187, 199 (*Sheila B.*).) While this standard of review is a deferential one, *substantial* evidence must be credible, reasonable, solid, and of ponderable legal significance. (*Conservatorship of O.B.* (2020) 9 Cal.5th

13

989, 1006.[3] At the same time, the question whether the court applied "the appropriate legal standard . . . raises a question of law, which we review de novo." (*Enrique M. v. Angelina V.* (2004) 121 Cal.App.4th 1371, 1378.)

B. *Analysis*

The Agency and the children first argue that the court applied the wrong legal standard when it made its dispositional orders. Specifically, they contend that the court erroneously "believe[d] the standard of proof by which a jurisdictional finding was made by itself determined the outcome of the dispositional orders." We disagree.

When the court made its jurisdictional finding, it explained that "there is a preponderance of the evidence that leads this court to believe that there is something going on in that household that needs supervision and observation. ¶ So I make a true finding, but it is by preponderance of the evidence." Preponderance of the evidence is the correct legal standard for the juvenile court to apply when determining whether the children fall under its jurisdiction. (§ 355; *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560-561.) Then, the court went on to explain that "[t]here is something going on in this case. It is not by clear and convincing evidence." Although the court did not specify what the "something" is that is happening, we infer it applied the "clear and convincing evidence" standard when determining whether to

---

3    Where, as here, "the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, . . . the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law" or, put another way, "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 (*In re I.W.*), disapproved on other grounds in *Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1010, fn. 7.)

14

remove the children from their parents' care. We thus conclude that the juvenile court applied the correct legal standard in its dispositional orders. (§ 361; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1432.)

Next, the Agency and the children contend "there was no substantial evidence to support the juvenile court's findings that [the Agency] and the [the children] had not met the burden [of clear and convincing evidence] to show risk of return." Phrased more simply, they maintain that any reasonable judge applying a clear and convincing evidence standard would necessarily conclude that returning the children to Father's custody posed a substantial risk to their well-being. After careful consideration of the evidence, we agree.

In fact, the evidence of Father's conduct and the resulting chaos and emotional harm suffered by the children due to Father's delusions was " 'uncontradicted and unimpeached.' " (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) As the court acknowledged, "The facts of this case are not really in dispute." It was uncontradicted that the children were aware of Father's use of physical restraints to immobilize Mother and installation of cameras and alarms throughout the home to track her. As the court stated, "The household dynamic creates a circumstance where even the older kids are involved in that restraint. That doesn't appear to be in dispute at all." It was also undisputed that Mother and the children believed Father's unsubstantiated claims that Mother was engaging in activities that put the children at risk, and that people were allegedly stalking the family due to Mother's connections and breaking into the home.

Nevertheless, despite the numerous videos Father provided the social worker, hospital staff and law enforcement that he claimed showed Mother's risky behavior, there was no evidence: 1) Mother engaged in the activities

15

described by Father; 2) Mother's restraints were needed or kept her safe; 3) Mother escaped her physical restraints and returned to captivity before Father awoke in the morning; and 4) intruders entered their home undetected and also tracked the family as they moved to different hotels and homes. Yet, Father persists in these delusions and continues to place the children and Mother at risk of harm.

Seemingly agreeing with the Agency and the children, the court had no trouble concluding that "there is something going on in that household that creates a danger and a risk" for the children. Yet it claimed to have "difficulty" determining the origin of that "danger" and "risk," whether it was Father's " 'fixed false belief' " or "the family dynamic that is . . . historically rife with domestic violence." These are the only two options the court articulated for its "confusion," but in either instance there is no substantial dispute that the children are at risk. Whether Father's delusional construct stems from false beliefs or represents an effort to exert power and control over Mother, Father is responsible for the chaos in the family and resulting psychological harm to the children. The Agency and the children therefore necessarily demonstrated that Father represents a substantial danger to the children by clear and convincing evidence.

There also was unimpeached evidence of the children's emotional harm from the children themselves and various therapists and psychologists. They were sleep deprived, hypervigilant, and anxious. T.D. was diagnosed as being a victim of emotional abuse which caused him to suffer from adjustment disorder with mixed anxiety and depressed mood. All the mental health providers opined the children were being emotionally harmed. The evidence was " 'of such a character and weight' " as to leave room for any determination other than that the Agency and the children had met their

burden of demonstrating a substantial risk of harm.  (See *In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)  Indeed, the objective observations of the social workers, therapists, law enforcement officers, and psychological evaluators effectively compelled a removal order.  Significantly, the court failed to address the opinions of the various professionals as to how Father's mental health issues detrimentally impacted the children's well-being.

The court was apparently impressed with Father's testimony, which led it to conclude he had "the intelligence and the thoughtfulness and the insightfulness to learn . . . and repeat" concepts presented in his "domestic violence course."  We do not dispute that evaluation; it is one the trial judge is uniquely suited to make.  But Father's intellectual abilities are not the issue.  A high IQ is no defense against mental delusions, and very intelligent people can exhibit very controlling behaviors.

Both parents argue that the court provided "reasonable means" to protect the children by requiring Father to live with the children at maternal grandparents.  (§ 361, subd. (c).)  But living with the maternal grandparents does not address Father's multiple mental health diagnoses, nor does it keep the children safe from "adopting and acting on" his "delusional belief system." Father's evaluator opined that he had already drawn his two oldest children into his "delusional beliefs" and "respective efforts to address [his] misguided concerns."  Additionally, a change of location will not protect the children as Father's delusions were not just occurring at his home.

We recognize it is not the appellate court's function to reweigh the evidence, and we do not do so here.  Rather, the trial court's reasoning reflects it was distracted from the key issue:  whether *Father* represented a substantial risk to the children.  Because the evidence on *that* issue was overwhelming and effectively undisputed, we are compelled to reverse.

17

DISPOSITION

The dispositional orders as to Father are reversed and the matter is remanded for further proceedings consistent with this opinion.[4]

DATO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

BUCHANAN, J.

---

[4] We base our disposition on the facts existing at the time of the dispositional hearing which we determined from the record on appeal. On remand, the juvenile court must make its decision based on the facts existing at the time of the further proceedings. (See, e.g., *In re M.V.* (2022) 78 Cal.App.5th 944, 971, fn. 9.)